STATE OF IOWA, Appellee, v. L. H. SHERMAN, Appellant.

**FALSE PRETENSES:** Evidence—Failure of Proof. In a prosecution for false pretenses, wherein the State relies on the testimony of *one* witness, a total failure of proof results from testimony which shows that the accused, in what he did say at the time and place alleged, either made a statement of *fact* or a statement of *opinion*, with no corroborating evidence in favor of either theory.

**FALSE PRETENSES:** Evidence—Falsity of Representations—Sufficiency. Evidence reviewed, and held insufficient to show the falsity of representations concerning the value of corporate stock, especially as part of the evidence related to values long *subsequent* to the time when the alleged false representations were made.

**FALSE PRETENSES:** Elements of Offense—Scienter. Knowledge on the part of an accused of the falsity of alleged false representations is an essential element of obtaining property by false pretenses.

*Appeal from Jasper District Court.—K. E. WILLCOCKSON,*
                            Judge.

                    MARCH 12, 1918.

THE defendant was indicted on the charge of obtaining
property by false pretenses. Trial to a jury, resulting in a
verdict of guilty. Judgment being entered on the verdict,
defendant appeals. The opinion states the facts.—*Reversed.*

*Morgan & Korf* and *Burrell & Devitt,* for appellant.

*H. M. Havner,* Attorney General, *F. C. Davidson,* As-
sistant Attorney General, and *M. R. Hammer, Jr.,* County
Attorney, for appellee.

GAYNOR, J.—The defendant is charged
with the crime of cheating by false pretenses.
It is alleged in the indictment that, on or
about the 24th day of April, 1913, the de-
fendant was indebted to the Bank of Sully in the aggregate
sum of $56,000, evidenced by certain promissory notes; that,
on said day, he feloniously, unlawfully, and designedly, and
with intent to cheat and defraud said bank, represented and
pretended to the cashier of the bank, F. G. Sherman, that
two certificates of stock of 500 shares each, of the par value
of $100 per share, purporting to have been issued by the Na-
tional Mausoleum Company, a corporation organized and
incorporated under the laws of California, were valuable,
and at said time had a market value of $32.50 per share, and
were of the aggregate value of $32,500; that he made these
representations and pretenses for the purpose of inducing
the said Sherman, as cashier of said bank, to believe the
representations to be true, and to induce the said Sherman
to accept said certificates and deliver to him the notes afore-
said, or some of them; that said Sherman believed said
representations to be true, received said certificates, and
delivered to the defendant the notes aforesaid, or some of

1. FALSE PRE-
TENSES: evi-
dence: failure
of proof.

them; that said representations were, in fact, untrue; that the defendant knew them to be untrue; that F. G. Sherman, acting for the bank, believed them to be true, and, so believing, accepted the certificates, and turned the notes aforesaid over to the defendant; that, as a matter of fact, said shares of stock did not have a market value of $32.50 a share at that time, or any other value, but were wholly worthless, all of which was well known to the defendant at said time.

To the charge thus made, the defendant entered a plea of not guilty, was tried to a jury, and convicted, and from this conviction appeals.

The first contention of the defendant is that the evidence does not justify the conviction.

To justify a conviction, the State must establish the following propositions beyond a reasonable doubt, and the court so told the jury in its instructions:

1. That the defendant made the representations to the cashier of the bank substantially as charged in the indictment, to wit, that the two certificates of stock of 500 shares each, described in the indictment, were valuable, and then, at that time, had a market value of $32.50 per share, and said shares were of the aggregate value of $32,500.

2. That said representation, if made, was false.

3. That the defendant knew it to be false at the time he made it.

4. That said representations were falsely and feloniously made, with intent and design to defraud the Bank of Sully of the ten promissory notes, or some of them, by inducing the said Sherman to deliver to him, the defendant, the said promissory notes, or some of them, in exchange for the two certificates of stock.

5. That the said F. G. Sherman, acting for the bank, believed and relied upon said representations at the time, and was induced to part with said promissory notes, or some of them, and to deliver them to the defendant, and to accept in

exchange therefor the two certificates of stock referred to in the indictment.

6. That, relying upon said representations, the said Sherman, acting for the bank, did deliver to the defendant the said promissory notes, or some of them, in exchange for said stock.

The court said to the jury that, if the State failed to establish any one of these allegations beyond a reasonable doubt, they should acquit the defendant.

F. G. Sherman, the cashier of the bank, was the only witness called by the State to prove the making of the representations charged to have been made by the defendant. His examination shows that he is defendant's brother; that he was cashier of the bank at the time, had been cashier for a number of years; that the defendant was formerly connected with the bank; that he severed his connection in 1898. Upon this point, he testified, in substance:

"I had a conversation with the defendant regarding the delivery of these notes to him and transfer to the bank of the shares of Mausoleum stock mentioned in the indictment."

He was asked this question:

"Tell the jury what was said on that occasion between you and the defendant. A. I don't remember what was said, at this time. I don't remember the conversation. Q. The question now is, Mr. Sherman,—you understand what I am asking you,—I am asking you for the conversation that took place between you and your brother in relation to his having transferred to you certain shares of Mausoleum stock, and you delivering to him certain notes of his, which were held by the Bank of Sully. A. I presume we had a conversation that day, but I don't remember the conversation. Q. Can you remember anything that was said between you in regard to that subject? A. There was a transfer made on that day, but I don't remember my conversation at that time with my brother. Q. Do you remember anything he

said to you in regard to the value of the stock? A. I think he said it had a value."

He was again asked for the conversation, and was asked to refresh his memory by examining the minutes of his testimony, attached to the indictment. He answered:

"Since I read the testimony that I gave before the grand jury, that refreshes my testimony. By the court: The question is, Mr. Sherman, you state the conversation had at that time between you and your brother relating to the matter, the delivery of the notes and the delivery of the stock. A. I took stocks and bonds of the Mausoleum Company and certain Canadian lands in exchange for the indebtedness he owed the bank."

The court then said to the witness:

"I understand this conversation is called for. State the conversation,—state all the conversation. What was said by you and what was said by your brother at and during your transaction, if there was any conversation. A. I do not know as I remember all the conversation between us. Q. Tell us what you can remember of it, if you cannot remember it all. Go ahead and tell us what was said about the corporation stock. A. I do not just remember exactly what that was figured at. There seems to be some difference in the testimony I gave before the grand jury and the books of the bank, and I must have been mistaken some way in the way that was figured. Q. Can you tell us what was said there that day, Mr. Sherman? A. It was my understanding that he told me what the value of the Mausoleum stock was. Q. What did he say about that? A. I understood him to say it was worth in the neighborhood of $32.50 a share. Q. What credit did you give him in exchange for the stock? A. Somewhere in the neighborhood of $26,000 or $27,000. Q. In what form was that? A. Credit on his note. Q. What is that? A. Credit on his indebtedness to the bank. Q. Did you deliver to him the notes that represented the in-

debtedness at that time?  A. All his notes were turned over to him at that time, at the time of the settlement, so far as I know."

He further testified:

"I do not recall any further conversation now.  I do not remember that he told me the date of the organization of the corporation, or anything being said about the organization of the company.  I think he said they expected to build mausoleums.  He was president of the company, I understood, and Mr. Selby was secretary.  Q. Did he tell you any of the assets that the corporation had?  A. Possibly he did, but I do not remember what the assets were, at this time. Q. Mr. Sherman, I ask you also, in addition to refreshing your recollection by reading the minutes of the matters taken before the grand jury, to refresh your recollection further by reading the testimony which you gave before the referee, or a portion of it.  Now, Mr. Sherman, after refreshing your memory as indicated, the question is, Can you tell us anything further that was said by Mr. Sherman in regard to the value of the Mausoleum stock?  A. It was my understanding it was worth $32.50 a share.  Q. I am asking you what he said about them.  It is not your understanding we are asking for, it is what he said.  A. Since I have read my testimony there, I think he said it was worth $32.50 a share.  Q. Is it not true he said to you at that time that this stock had a market value of $32.50 a share? A. I do not remember him saying it had a market value of $32.50 a share, but I understood he said it was worth that. Q. I will ask you if he did not say at that time that this stock had a value of $32.50 a share.  A. I do not remember that he said it had a market value of $32.50 a share, but it was my understanding that it was worth $32.50, but I don't know as he said it had a market value.  Q. I will ask you the question if, in your conversation that day, he didn't say to you, in words or substance, that this stock had a

value of $32.50 a share. A. Yes, sir, I think he did."

He further testified that the notes in question and the interest amounted to $56,661.92; that the defendant's total indebtedness at the bank, including overdraft, was $59,-308.41. He said:

"I took the Canada land. Two items, the Sturgan contract at $26,960, and other Canada land, $7,400, was credited to these notes and indebtedness of the defendant, making $34,360.00; that the defendant's total indebtedness on the notes and interest was $56,691.02. On this I have applied $34,360, proceeds of the land and Sturgan contract. I credited him on the notes from Sturgan contract, $26,960, and I credited him on the notes for the other Canada land, not included in the Sturgan contract, $7,400."

On cross-examination, he answered:

"It is my understanding at the time that he said he thought the Mausoleum stock was worth $32.50."

He testified further, on cross-examination:

"Q. Did you not testify before the referee, in substance, that defendant told you he thought the stock was worth $32.50, or if it was not, it soon would be? A. I don't remember. I could tell by referring to the testimony before the Federal— Q. If you have refreshed your recollection by this record, tell the jury whether or not you did not tell the referee, in substance, that he told you he thought the stock was worth $32.50 a share, or soon would be? A. That was what I testified before the Federal jury. Q. That is true? A. Yes, sir. Q. Didn't you also testify before the referee that your brother told you he would take up this Mausoleum stock at what you took it in at? A. I do not remember."

He was asked to refresh his memory by examining the report of the proceedings before the referee.

"Q. After having refreshed your recollection, didn't you say, in substance, that your brother told you, or that you

had an understanding with your brother, that he would take up the stock in the future at what you took it at, if you wanted to, and that is the reason you took the stock? A. Yes, sir, I testified to that. Q. And that was true? A. I think it was. Q. Didn't you say, in answer to this question, you took it on the condition that he would dispose of it and hold you harmless,—is not that true? A. Yes, sir, that is my testimony before the referee. I testified that with this understanding I accepted the stock, and that is as true now as when I testified before the referee. My brother came to Sully in April, 1913, in response to a letter from me. I had a deal to sell the bank, and after my brother came, we drew up a proposed draft of an agreement of partnership between myself and Charlie Boat and Verrancamp, for the purpose of increasing the capital stock of the bank. I wanted defendant to put his indebtedness in another form. I told him he should reduce his indebtedness to the bank. I was quite heavily indebted to the bank at that time. Q. Was it for the purpose of reducing your indebtedness to the bank that the Mausoleum stock was put into the bank by you at a considerable increased price at what you received it from your brother for? A. Yes, sir. Q. That increase in price that you received from the bank for the stock was used in reducing your indebtedness to the bank? A. Yes, sir. Q. That indebtedness consisted largely of an overdraft and notes? A. Yes, sir."

On redirect examination, he was asked this question, in substance:

"You were asked, on cross-examination, that the conversation that occurred between you and your brother at the time of the transfer of the certificates, and at the time of the delivery of the notes to him, if he didn't say that he thought the stock had a value of $32.50 per share. I want you to tell us again just what you said on that subject. A. It was taken in at $32.50 a share. By the court: The ques-

tion is, What was said by your brother? A. I do not know what was said there. Q. Can you recall what was said there in regard to the value of that stock? A. I understand he said he thought it was worth $32.50 a share. Q. What did he say,—not what you understand,—but what did your brother say? By the court: If you don't remember, say so; if you do, say what he said. A. I don't remember the exact conversation. It was my understanding it was worth $32.50 a share. Q. Didn't he say to you at that time that the stock had a market value of $32.50 a share, and that it would be worth more than that in the future,—didn't he say that to you? A. Don't remember of his saying that in those words. Q. Did he say that in substance? A. Yes, sir."

On re-cross-examination, he was asked this question:

"You believed he would take it off your hands? A. Yes, sir. Q. You relied on it? A. Yes, sir. Q. That is the real reason,—that and the reason you wanted to get his paper out of the bank, is the reason you wanted to make this deal, isn't it? A. I suppose it is."

The defendant testified on this point:

"I didn't tell F. G. Sherman, my brother, that the Mausoleum stock mentioned in this case was worth $32.50 a share, or had a market value of $32.50 a share. I didn't tell him what it was worth. The only value that I gave him was the value that the stock had been sold at."

This is all the evidence offered by the State,—in fact all the evidence in the record tending to show that the defendant made the representations charged in the indictment to have been made by him.

The court said to the jury, and it is the law of the case, that, in order to convict the defendant, the State must establish beyond a reasonable doubt that, on or about the time alleged in the indictment, the defendant designedly and feloniously made to the cashier of the Bank of Sully the following representations:

"That two certificates of stock of 500 shares each, of the par value of $100 per share, purporting to have been issued by the National Mausoleum Company, * * * were valuable, and then and at that time had a market value of $32.50 per share, and said shares were of the aggregate value of $32,500; and no other alleged representations will be considered by you * * * except as above mentioned and set out in this instruction."

Before coming to the analysis of this testimony, it is well to have before the mind the circumstances and conditions that led to the meeting on this day when it is claimed this Mausoleum stock was exchanged for the notes.

On the 19th day of March, 1913, F. G. Sherman, cashier of this bank, wrote to the plaintiff a letter addressed to him in California, as follows:

"Dear Brother: For the life of me, I don't see where we are going to be able to swing things here for April 1st: wish you were here now to assist me in a few ways just how to swing things. I hate to lay down or give up, but I do declare I don't know what to do; possibly I can get the boys to help me some more if I can make them safe in what Canada lands and Canada contracts I have, but I don't see how we will swing the deal for that time unless we have eleven or twelve thousand, and I don't see where it's coming from. I suppose it will be impossible for you to get here and help me out, but I do wish you could come, and in some way I think you ought to be able to help me in some way, I think if you were here we could figure it out some way to swing the deal here until possibly we could fix or tide things over, wish you would wire me on receipt of this, I cannot see any light at present where anything is coming to speak of, but as I said I think if you were here you and I together could make things secure enough so the boys would help us out. Answer at once, and I will try my best to do something, or do something, do what you think

best. I don't know what to do, but I wish you would help me, and I do think Lofland and Blackburn would help us over if we would talk to them and make them secure."

On March 24th, the defendant replied:

"I will transfer $20,000 worth Canada lands to secure any deal you make. Lay the matter frankly before Fred Andreas, also before Fred and Welle. I will stand back of you for any deal you make. Two letters on way."

Defendant arrived from California some time in April, in response to this letter.

The cashier, Sherman, testified further that, when the defendant arrived, he (the cashier) had a deal on to sell the bank; that, after his brother, the defendant, arrived, they drew up a proposed draft of an agreement of partnership between the witness and others, for the purpose of increasing the capital stock of the bank. The witness said:

"I wanted to put the defendant's indebtedness in another form. I told him he should reduce his indebtedness to the bank."

He further stated that the real reason he wanted to get his brother's paper out of the bank was that he might make this deal; or he said, "At least, I suppose that was the reason." The notes delivered to the defendant were dated in 1908, 1909, and 1910, and one as late as 1912. It appears that, at the time the transfer of these notes was made for the land contracts, the stock and the notes, with interest, aggregated $56,661.92; that there was about $3,000 interest due and unpaid upon the notes; that, at that time, the defendant was indebted to the bank for an overdraft about $2,646. It does not appear in this record that the defendant had any property other than that which was turned over to the bank at the time of this transaction, called by the cashier, Sherman, a settlement. It does not appear that the notes turned over had any value except that which rests in presumption. This may account for the desire of the cash-

ier to get the notes out of the bank before "pulling off" the deal which he said he had on hand at the time his brother arrived.

There is nothing in the record to show that the defendant, at the time of the transaction called in question, made any statement to the witness Sherman touching any substantive fact affecting the value of the stock, or supporting an opinion that the stock had a value claimed by the State. The witness says, "I don't remember that he told me even the date of the organization of the corporation." He does not attempt to say that, in this conversation, the defendant made any statement as to what the stock was selling for upon the market, what it had sold for upon the market, whether the stock was paid for or not, what the capital stock of the company was, what its assets were, or any statement tending to support the assumption that the stock had a value. He does say, however, that the defendant was president of the company. The nearest he comes to making any statement touching the assets is in answer to the question:

"Did he tell you any of the assets that the corporation had? A. Possibly he did, but I don't remember what the assets were at the time."

This is not an affirmative statement that the defendant did make any statement touching the assets. What is the witness' testimony on this? That he does not remember the conversation had with his brother touching the transfer of the notes to him for the Mausoleum stock.

"I presume we had a conversation that day, but I don't remember the conversation. I think he said it had a value, but I don't know as I remember the conversation,—that is, all the conversation. It was my understanding that he told me what the value of the Mausoleum stock was. I understood him to say it was worth in the neighborhood of $32.50. It was my understanding it was worth $32.50 a share. I don't remember him saying it had a market value

of $32.50 a share, but I understood it was worth that, but I don't know as he said it had a market value. I think he said, in substance, that the stock had a value of $32.50 a share."

But he does not say whether defendant said that was the face value, the actual value, or the market value.

On cross-examination, he was asked this question:

"You said, on direct examination, that it was your understanding that the defendant said the stock was worth $32.50 a share. That is what he said, wasn't it? A. Yes, sir, that was what I understood it to be. That was my under-standing, that he thought it was worth $32.50 a share. That is exactly what he said. My understanding was that he thought the stock was worth that money."

On redirect examination, he was again approached on this subject, and asked to state what his brother said touch-ing the value of this stock. His answer was:

"I don't remember what was said there. I understand he said he thought it was worth $32.50 a share. I don't re-member the exact conversation: it was my understanding it was worth $32.50 a share."

The question was then finally propounded to him:

"Didn't he say to you at that time that the stock had a market value of $32.50 a share; that it would be worth more than that in the future,—didn't he say that to you? A. I don't remember his saying that in those words. He said that in substance. I think he said he would take it off my hands. I don't think we agreed on a price. I supposed he would take it off my hands at what I gave for it, anyway. I believed he would take it off my hands, and I relied upon his doing so. That and that I wanted to get his paper out of the bank is the reason I wanted to make the deal, I sup-pose."

Assuming, for the purpose of this discussion, that the representation set out in the indictment, if proven, would

constitute such false pretense as brings the case within the provisions of the statute (Code Section 5041), which reads, "If any person, designedly and by false pretenses, * * * and with intent to defraud, obtain from another any money, goods or other property, * * * he shall be imprisoned in the penitentiary not more than seven years," etc.,—the mind naturally inquires which of the several statements testified to by this witness is the statement made by the defendant, at the time of the transaction, and relied upon by the cashier in consummating the transaction. Clearly, if the statement made by the defendant was that he thought the stock was worth $32.50 a share, such statement would be simply an opinion, and would not be the basis for a criminal prosecution. What the mental attitude of this witness was towards the whole transaction, and towards the prosecution, we are not in a position to know. We must take his evidence as we find it in the record. In this record, he has assured us that all the defendant said was that he thought the stock was worth $32.50 a share. If the defendant stated as this witness testifies in some portions of his evidence, we may assume that it sustained a charge of false pretense, under the statute. If, however, he stated only that he thought it was worth $32.50 per share, then clearly, under all the authorities, such statement would not bring defendant within the provisions of the statute as to false pretense. See *State v. Webb*, 26 Iowa 262. Whether he made a statement which constitutes an actionable pretense or a statement which does not make an actionable pretense, was a mere matter of conjecture. When we consider that the burden of proof is upon the State to show, beyond a reasonable doubt, that he was guilty of making actionable pretense, and the evidence offered as clearly shows a nonactionable pretense, how can a jury say that the actionable pretense is proven? When the evidence relied upon establishes a nonactionable pretense, just as clearly as it establishes an actionable pretense, and

from the mouth of the same witness, with no circumstances in the record tending to support the one statement rather than the other, with the record tending rather to support the making of the nonactionable pretense, we cannot see that the State has carried the burden placed upon it to a successful issue. No verdict can be sustained on such uncertain proof of a fact essential to the consummated crime. We think the evidence insufficient to justify a jury in finding that the defendant made the representations alleged to have been made by him. We say that the record is wholly insufficient to justify a jury in saying that the defendant made the actionable pretense charged in the indictment, assuming such pretense to be actionable.

2. FALSE PRE-
TENSES : evi-
dence : falsity
of representa-
tions : suf-
ficiency.

The next question that presents itself in the record upon this point is, Assuming that the actionable pretense was proven, has the State established its falsity? Or has it introduced any evidence upon which a jury could find that the pretense was in fact false, if made?

The only evidence upon this point is found in the following facts disclosed in the record: One Ralph Graham was called as a witness, and stated that he lived in California; that he was an attorney at law; that he knows the secretary of the Mausoleum Company, and one Hiatt. This Hiatt was one of the original incorporators. He acted as attorney for the company. He said he was not acquainted with the value of corporation stock in California, or in the city of Los Angeles in general; that he had made some investigation to ascertain what the value of the capital stock of the Mausoleum Company was in 1913; that he never heard of the Mausoleum Company, did not know there was such a company, until the fall of 1914; that he examined the books of the company to some extent in the fall of 1914 with this Mr. Hiatt, and examined the records in the county clerk's office; that he found a certificate to the effect that the

charter of the company had been forfeited for nonpayment of license; that this forfeiture occurred on the 28th day of February, 1914, as it appears in the records of the clerk's office. He was then asked this question: .

"Upon this investigation, state what, in your judgment, was the value of the capital stock of the corporation on the 24th of April, 1913. A. Had no market value."

On cross-examination, he said:

"I first learned that there was a National Mausoleum Company of California in the fall of 1914, and first examined its books then. I did not examine its bank book. I did not examine the assessment roll of the county for that year. I know that there was some stock of this corporation sold, but do not know at what price. My opinion is based partly on an examination of the record of the transactions that occurred a year and six months after the date inquired about, or approximately so. I do not know at this time how much stock was sold. I did know at the time. At least, I knew what the books showed, or rather, what was issued. I only examined a part of the records of the company, which was some time in the summer or fall of 1914. The county attorney of Jasper County sent me a telegram, and told me to render whatever assistance I could to the sheriff; and to that extent I was in the employ of the county. I recently got a draft from the county as attorney out here. That came from the bank down at Sully. I do not know of any Mausoleum stock selling out in California, or what they are selling for. I do not know personally what the stock in this corporation sold for. I don't know how much was sold, but I know that some of it was sold."

One Macy was called as a witness, who said he lived in Lynnville, Iowa. He testified that he was partially acquainted with the books of the bank and the transactions that occurred in the Sully Bank.

"I made an investigation of the shares of stock. That

investigation consisted in writing to one Hiatt, Los Angeles, California; and I employed E. J. Salmon to come to Los Angeles to make an investigation, and he made a report as to the value of this stock. A report was also made to me by Hiatt. The report from Hiatt came in the form of a letter. The letter was as follows: 'Regarding the shares of stock in the National Mausoleum Company, can only say that they are of no value. This company was organized for the purpose, as its name indicates, of building mausoleums in California, under patents known as the International Patents. It became the owner of an option to purchase the patent rights from the Iowa Mausoleum Company of Waterloo, Iowa, for the state of California; but it failed to make its payments, and lost its option. Its charter has been forfeited for failure to pay the state license taxes, and the corporation no longer exists.' I showed this letter to Mr. Sherman, the defendant."

He was asked this question:

"What did you state to Mr. Sherman, and what did Mr. Sherman say to you in regard to the value of this stock at that time and during the conversation? A. I made no statement, except read the letter to Mr. Sherman relative to the stock. Q. Was that letter read by you to Mr. Sherman as a part of the conversation? A. That portion relating to the Mausoleum stock was read. Q. Then what did Mr. Sherman say? A. As I remember it, he says, 'That is true, but Mr. Hiatt should have explained further relative to the re-organization of the company, and gone on to explain more about the company,—the situation of the company.' "

This letter of Hiatt's was dated May 26, 1914, but when it was shown to the defendant does not affirmatively appear. The letter evidently speaks of the condition of the company at the date of the writing of the letter. There was no reference in the letter as to the condition the year previous, and it is assumed now that the defendant's assent to the state-

ment in the letter (the letter, of course, not being competent as evidence) has probative force as to the value of the stock in April, 1913. The evidence shows simply an assent, if it has any probative force at all upon the matter, to the statement in Hiatt's letter that, at that time, the stock had no value. The facts upon which Hiatt seems to predicate his statement that it had no value, are facts happening long after the transaction in question; and the statement of the defendant might well be construed into an assent to the statement of Hiatt as to the then value of the stock, but could not be construed into an assent on the part of the defendant, or an admission that the stock had no value in April, 1913, more than a year previous. The general rule is that a condition shown to exist is presumed to continue. But the rule ordinarily is that such presumptions do not relate backward. It is a fact of common observation that enterprises of this kind do start with every promise of success, and later, the honest dreams of the promoters are broken by a sad awakening.

The question before the jury was, What was the value of the stock in April, 1913? Proof of the condition of the corporation or of the value of the stock a year and six months, or even a year later, is no proof of its value on the day charged.

We think the evidence wholly fails to establish this essential element in the charge made.

3. FALSE PRE-
TENSES: ele-
ments of of-
fense: *scienter.*

The next point is, Did the defendant know, at the time the representations were made, if made, that they were false?

There is absolutely no evidence to establish this fact, except that the defendant was president of the company at the time, and that, a year later than the time the representations were made, some evidence was introduced tending to show that the stock was then worthless. The burden is on the State, not only to show that the representations

were made, and that they were false, but that the defendant knew they were false, at the time he made them.

It is true that, in civil actions for fraud, it has been held that a statement that a fact exists, as of the knowedge of the one asserting the fact, when he has no knowledge of the fact, and when it is made recklessly, and for the purpose of inducing another to believe it to be true, followed by proof that it was, in fact, not true, makes the *scienter* required in civil actions. There is no proof in this case that the defendant knew the fact to be untrue, if untrue. In *State v. Rivers,* 58 Iowa 102, the defendant was indicted for obtaining money and property by false pretenses. This court said:

"If he made such representation, knowing that it was not a valid lien, and the cashier was thereby induced to give up the mortgage, he is guilty; but if he believed it to be true, or did not know it to be false,   *   *   *   he is not guilty."

We have examined this record with care, and are satis- fied that, on the points above indicated, there was such failure of proof on the part of the State that the verdict ought not to be permitted to stand. The cause is, there- fore,—*Reversed and remanded.*

LADD, SALINGER, and STEVENS, JJ., concur.

SALINGER, J.—I am not in accord with the argument on what "makes the *scienter* required in civil actions." With that exception, I concur.