STATE OF IOWA, Appellee, v. WILLIAM T. GEORGE, Appellant.

OCTOBER 16, 1928.

*W. W. Rankin* and *John E. Holmes,* for appellant.

*John Fletcher,* Attorney-general, and *Neill Garrett,* Assistant Attorney-general, for appellee.

MORLING, J.—I. We shall first consider the question of the sufficiency of the evidence to sustain the conviction. The in-

dictment alleges that the defendant represented to Bookin that defendant "was the owner in fee simple of certain real estate in Appanoose County, on which he, the said William T. George, would give a mortgage to secure the payment of a note for $300. * * * he desired to borrow * * * wherefore [whereas] in truth and in fact said William T. George was not the owner of said land at the time, nor had he any land at that time in Appanoose County * * *" This is the representation and the falsity alleged. The representation and its falsity must be proved beyond reasonable doubt.

The land which defendant proposed to mortgage, and which he did mortgage, pursuant to the alleged representation, is described in the mortgage as the real estate situated in Appanoose County, Iowa, described as follows, to wit:

"All that part of the east half of the northeast quarter of the northwest quarter of Section one (1), Township sixty-nine (69), Range eighteen (18) west 5th P. M. lying of the south side of Chariton River, Appanoose County, Iowa, 20 acres, more or less."

Bookin testifies:

"The defendant asked for the loan of $300 on 20 acres of land he had in Appanoose County, Iowa, on May 23 or 24, 1925, at our office. This loan was on the security of that 20 acres of land which he said he owned. * * * George said he owned the land, and had all the papers for it and an abstract. * * * I went with him to see the land in Appanoose County, Iowa, and then to Centerville, Iowa, to look over the records. * * * George and I drove in a car to Appanoose County on May 25, 1925. Between Albia and Centerville somewhere, we crossed a railroad track, and stopped the car. We got out, and George pointed out to me the land he said he owned. We went over the land."

Bookin does not claim that he was not shown the right land; "I could not claim that." "Mr. George told me it contained 20 acres." They then went to the recorder's office in Centerville, "to examine the records." He asked the recorder to assist him. The recorder testifies, without contradiction, that

Bookin "had me go over the records * * *. That is, I got the records for him. * * * He wanted to look up the records.'' He says that Bookin asked for the deed indexes, and also the mortgage indexes; that he got the deed records and the mortgage records; that he was there about two and one-half hours; that after Bookin and defendant · had examined the records, Bookin "said he was satisfied.'' · Bookin said that the recorder told· him there was not anything against the land, and that it was in defendant's name; and that he relied on it, as well as on what George had told him. The note and mortgage were then and there made out, mortgage recorded, and a check for part of the amount given defendant. Defendant had an abstract which he, with Bookin, took to the abstracter's office, to have it continued. The abstracter "was unable to get it done that day. Left·it with Mr. Law, who sent· it to me [Bookin] later.''

As we understand the claim of the State, it is that the defendant was not the owner of "that part of the south half of the northeast.quarter of the northwest quarter'' of this Section 1 "bounded on the east by the Chicago, Milwaukee & St. Paul Railway and on the west by the Chariton River.'' That is to say, according to the State's claim, there is an overlapping of titles to that part of the land described in the mortgage which may be included in the description last set out. It will be noticed that the north line of the section in question is the township line. It appears that the section, as ordinarily in such cases, is fractional. The evidence does not show that any survey of the land described in the mortgage or of that within the overlapping title has been made. On this record, it is a matter of conjecture whether the Chariton River has occupied the same bed since the land was surveyed and patented, and where it has been, or is now, as respects the north boundary claimed by defendant, or the west boundary of the land within the overlapping title. The State introduced a map showing the river to enter (or leave) the section at the north line near the west side of the east half of the northeast quarter of the northwest quarter, and that its channel ran irregularly thence south and southeastwardly, across the east line of the section, thence southwesterly, and thence northwesterly across the east half, and also across the west half, thence southerly near the west line

of the west half of the northeast quarter of the northwest quarter, crossing the south line into the west half of the southeast quarter of the northwest quarter, and thence southeasterly until it leaves the section. It also shows a railroad track running from the northeast to the southwest, across the southeast corner of the east half of the northeast quarter of the northwest quarter, leaving a small part of the land on the east side of the track, and the larger part on the west side. The evidence of the correctness of this map relates to the time of the trial only. The defendant introduced a map, apparently showing the Chariton River running along the greater part of the north line of the east half of the northeast quarter of the northwest quarter, and again cutting off a few acres from the southeast of this tract. It is impossible to reconcile these two maps. The defendant was making the claim that the Chariton River had changed its bed. The theory of the State was that Rody Polish was the owner of the overlapping title. This claim of title is apparently based upon a deed from one Mitchell to Polish, shown in Polish's abstract of title, dated March 2, 1915, the description in which is as follows:

"The north ¼ of the NW¼ of the NW¼ and also beginning at a point 20 rods south and 39 rods east of the NW corner of Section one thence running south 50° east 18 rods thence east 27 rods and 9 feet to the 40-acre line, thence north along said 40-acre line 187 feet thence west 41 rods to the place of beginning. Also all of that part of the west ½ of the NW¼ of the NE¼ of the NW¼ of Section one lying south of the Chariton River. Also all of that part of the southeast ¼ of the northwest ¼ of the northeast ¼ of the NW¼ of Section 1, lying south and west of the Chariton River. Also all that part of the south ½ of the NE¼ of the NW¼ of Section one bounded on the east by the C. M. & St. P. Ry. right of way and on the west by the Chariton River all in Section one (1) Township sixty-nine (69) Range eighteen (18). Except coal."

The defendant's claim of title is under deed to him from Dove M. Roop, dated July 27, 1923, acknowledged July 28, 1923, containing description of land claimed by him, as above set out, subject to a mortgage of $1,200, which defendant assumed. This mortgage included other land, and the evidence is that the

defendant paid $800 upon it, and secured a release. The State introduced the files in an action by Dove M. Roop against W. G. Seals, to recover the rental value of this land. The petition was filed October 25, 1922. Polish intervened, with a cross-petition to quiet title, filed December 28, 1922. The plaintiff, Roop, filed a reply to this cross-petition in December, 1922, and a dismissal of her petition the next May. In the files is an instrument labeled as "decree." While there is no evidence that any decree was ever entered in the case, and no court record appears to have been offered, defendant in argument apparently assumes that decree was entered. The decree recites appearances by plaintiff and intervener, and purports to quiet title in Polish to the land described in Polish's deed above set out. The date of this decree is September 10, 1924; whereas, as has been noted, the deed from Roop to George was acknowledged July 28, 1923, though it was recorded December 23, 1924. There is no evidence with respect to defendant's then knowledge of the pendency of the proceedings or the intervener's then knowledge of defendant's deed. Dove M. Roop married defendant in August, 1925. She testifies that her attorney told her, when she dropped the suit, that it did not affect the title. After this answer, an objection was made. The objection was sustained, over defendant's exception. The record shows this answer and objection, but no motion to strike, or striking.

Bookin's testimony is that, when Bookin and defendant were in the abstracter's office at the time previously referred to, the abstracter asked defendant, "How about the Roop case?" and defendant said "it had nothing to do with this property, on account of the river bed, changing its bed." The abstracter, in the continuation which he made of the abstract previously referred to, mentioned the Roop against Polish case as "not shown in the abstract for the fact that the present owner hereof claims that the decree * * * does not include any of the land in the caption of this abstract, for the reason of the river bed, changing its course." The State introduced, without objection, the defendant's abstract of title and continuation which has been referred to, and also an abstract of title continued by the same abstracter, covering all the land of Polish as above described, brought down only to December 26, 1922. The abstracter, as a witness for the State, testified, on cross-examina-

tion: "As at [a] matter of fact, I do not know whether Exhibit G [Polish's abstract] covers land that overlaps any of the land covered by Exhibit C" (defendant's abstract); although he says, "The east half of a tract of land and the south half of that same tract overlaps, in the southeast corner of that tract."

Polish testifies that he was in possession of the land described in his abstract, and lived on it, all the time, except for two years, since he bought it, and paid the taxes. He does not say whether or not his possession was under claim of ownership, or whether it was disputed. He does not refer to the suit which has been mentioned.

There is also evidence of the existence of a trade between Gibson and defendant before the negotiation of the loan in controversy, in which defendant conveyed the land to Gibson, and Gibson conveyed it back, for want of good title. Both these conveyances are by warranty deed. Gibson testifies to the receipt of a letter from an abstracter (other than the abstracter previously referred to), dated May 7, 1925, reciting the decree previously mentioned, and that the writer "ran across an abstract which shows the title in Harper and a correct chain of title down to him in the attorney's office, and the attorney told me that 'Rode Polich had another abstract, showing the title in him,' both titles coming through George Raney; but that the Polich title was first." Gibson testifies that he told George "exactly what the abstracter had written in this letter, and that George could not make a merchantable abstract;" but he does not say when this conversation was.

The State argues that the defendant's abstract was a forgery. We find no ground for this assertion, and, as has been said, the abstract was introduced by the State. Polish testifies that in the land as described in the deed to defendant, "there is about 4 or 5 acres that lies south of the river."

Defendant's abstract of title contains 30 or more entries and notations. It contains a number of descriptions by metes and bounds. The abstract to the Polish land is still larger, and contains numerous descriptions. As an illustration, one is:

"Und one half of the west half of northeast quarter of the northwest quarter of Section 1 in Township 69, Range 18, sup-

posed to be 13 acres lying on the south and east side of Chariton River.''

While no objection appears to have been made to the offer in evidence of the abstracts, it would be a manifest travesty to submit them to a jury and leave the jury to find, upon them, that the defendant, on May 23 and 25, 1925, did not have title to the land he is claiming, and that he is, therefore, guilty of felony. The testimony to defendant's alleged representation that he ''said he owned the land, and had all the papers for it, and an abstract,'' would indicate a representation both of actual ownership and paper title. The State had the burden of proof. It has not proved absence of actual ownership, and the evidence which was introduced as to the paper title, in substance, is two conflicting paper chains of title. It submits two elaborate and complicated abstracts of title, one of them ending more than two years before the date to which the inquiry relates, and the records in a court proceeding, a judgment in which was rendered several months after defendant apparently got his deed, though the action was then pending, to a jury, to determine questions of title upon which the traditional sage ''the Philadelphia lawyer'' would hardly hazard an opinion. The abstracter, with the records before him, did not know whether the land in the Polish abstract overlapped any of the land covered by defendant's abstract. The State's claim seems to reduce itself to this: that defendant, in saying ''he owned the land,'' represented that he was the owner, and had paper title to 30 acres, whereas his undisputed title embraces ''about 4 or 5 acres.''

Without a further detailing of the evidence, it is manifest that the State's contention that defendant's alleged representations were false, and known to him to be such, and that they were intentional, rested upon evidence altogether too conjectural and flimsy to support a conviction of crime. *State v. Sherman*, 183 Iowa 42; *State v. Webb*, 26 Iowa 262.

Defendant urges that ''the court was without jurisdiction,'' because the crime, if any, was committed in Appanoose County, and not in Wapello County, where the indictment was found. He relies upon language in *State v. House*, 55 Iowa 466, 472, namely:

''The false pretenses made in Wright County were no

crime, and no indictment would lie in that county, simply because the notes were not obtained there. The crime was consummated in Polk County, and the court might very properly have instructed the jury that, if the notes were obtained in Polk County, the indictment would lie, no matter where the false representations which induced Addison to give the notes were made."

Defendant urges that the money was paid to him in Appanoose County, and that the venue should have been laid there. The record here is not clear in what county it was that the prosecuting witness parted with $50 of the loan, though, as we read the evidence, the prosecuting witness paid defendant "the balance of the loan" in his office in Ottumwa. Defendant's representation that he owned the land and had all the papers for it and an abstract, as we interpret the evidence, was made before the trip to the land and to Centerville, and was made in Bookin's office in Ottumwa. We are of the opinion that the evidence, if it shows the commission of the crime, may be held to show that it was committed partly in Wapello County, and partly in Appanoose County, and that the indictment might be found in either county. *State v. Gibson,* 132 Iowa 53; *State v. Detloff,* 201 Iowa 159.

II. Defendant complains of the admission in evidence of the abstracter's letter to Gibson, previously referred to. We are of the opinion that, under Gibson's testimony, the letter was admissible on the question of defendant's knowledge and intent, and also that its admission was without prejudice.

III. Defendant submits a number of other propositions which we find it unnecessary to discuss.—*Reversed.*

STEVENS, C. J., and DE GRAFF, ALBERT, and WAGNER, JJ., concur.