STATE OF IOWA, Appellee, v. R. V. MCCUTCHAN, Appellant.

No. 42547.

1030

FEBRUARY 12, 1935.

REHEARING DENIED JUNE 21, 1935.

J. O. Boyd, Max Kinney and Ludie S. Davis, for appellant.

Edward L. O'Connor, Attorney-general, Walter F. Maley, Assistant Attorney-general, and J. V. Gray, County Attorney, for appellee.

HAMILTON, J.—The defendant, R. V. McCutchan, was indicted by the grand jury of Henry county, Iowa, for the false uttering of a bank check, under section 13047 of the 1931 Code of Iowa, the accusation being that the said R. V. McCutchan, on or about the 2d day of November, A. D. 1932, in the county and state aforesaid, did with fraudulent intent utter and deliver to the Olds Savings Bank of Olds, Iowa, a certain bank check in the sum of $5,000, upon the State Central Savings Bank of Keokuk, Iowa, made payable to R. V. McCutchan, and did secure money, credit, and things of value therefor, and knowingly did not have an arrangement, understanding, or funds with such bank, sufficient to meet or pay the same.

Section 13047 of the 1931 Code of Iowa is as follows:

"False drawing or uttering of checks. Any person who with fraudulent intent shall make, utter, draw, deliver, or give any check, draft, or written order upon any bank, person, or corporation and who secures money, credit, or thing of value therefor, and who knowingly shall not have an arrangement, understanding, or funds with such bank, person or corporation sufficient to meet or pay the same, shall be guilty of a felony, if such check, draft or written order shall be for the sum of twenty dollars or more, and shall on conviction thereof be punished as in section 13045, and if such check, draft or written order be for less than twenty dollars, shall be guilty of a misdemeanor, and upon conviction thereof, shall be punished by fine not to exceed one hundred dollars, or by imprisonment in the county jail not to exceed thirty days."

The essential elements of the crime charged are: (1) Fraudulent intent; (2) securing money, credit, or other thing of value therefor; (3) knowingly not having any arrangements, understanding, or funds in such bank to meet or pay the check; and (4) that the Olds Savings Bank of Olds, Iowa, was defrauded in some amount by the passing and delivery of said check.

It would serve no useful purpose to set out at length and in detail the evidence which the trial court permitted to go to the jury. Was there competent evidence which tended to establish, and

from which the jury could find, under the instructions of the court, and beyond a reasonable doubt, the foregoing essential elements of the crime as charged in the indictment?

The defendant admits, and it is established beyond any question by the evidence, that he issued the check for $5,000 on the State Central Savings Bank of Keokuk, Iowa, bearing date of November 1, 1932, signed "McCutchan Land Co., R. V. McCutchan", payable to himself, and that he indorsed it "R. V. McCutchan". He also admits in his testimony, and it is established by the evidence, that on the 1st day of November, 1932, the date of the issuance of said check, neither the defendant nor McCutchan Land Company had any funds in the above-named bank at Keokuk, Iowa, and that on that date he had made no arrangements whatsoever with the bank on which it was issued to take care of this check. In addition to the defendant's admission, E. A. Ebersole, who had been connected with the State Central Savings Bank of Keokuk, Iowa, for twelve years, and who had been cashier of said bank since February, 1933, testified that, at the time this check, described in the indictment, and which is referred to in the record as Exhibit 1, was written and presented to his bank, in so far as he knew there had been no arrangements made with the bank by R. V. McCutchan or the McCutchan Land Company to honor said check. The defendant does not claim otherwise. Therefore, at the time the check was issued, it was issued by him knowingly, not having any arrangements or understanding or funds with the bank on which it was drawn to meet or pay the same.

According to the defendant's version, three days after the check was issued that is, on November 3, 1932, he went to Davidson & Curtis, a commission firm located at Bushnell, Illinois, and persuaded them to issue him a fictitious check for a like sum of $5,000 on a bank in Illinois, which check he said he would take to the State Central Savings Bank at Keokuk, Iowa, and deposit to meet the check, Exhibit 1, and he in turn issued his own check, upon the Olds Savings Bank of Olds, Iowa, payable to Davidson & Curtis for the sum of $5,000, in exchange for their $5,000 check. The defendant delivered the $5,000 check which he received from Davidson & Curtis to the State Central Savings Bank at Keokuk, Iowa, but it was never deposited to his account in that bank, and was only taken by the bank for collection. Neither of these checks was ever paid. It will be noticed that there was no money to support or meet any of these checks. He claims it was a plan, worked out by himself

for the purpose of obtaining credit for a few days, while the checks were clearing, and it was done for the accommodation of Mr. Morgan, to enable Morgan "to get this money into his bank". The check, Exhibit 1, bears the indorsement of the Olds Savings Bank of Olds, Iowa, and was included in the deposits of the Olds Savings Bank of November 2, 1932, and the remittance sheet shows that it was sent by the Olds Savings Bank to the Drovers National Bank of Chicago for clearance and credit. It went through the Federal Reserve Bank of Chicago to the bank at Keokuk, Iowa, on which it was drawn. There, on November 4, 1932, it was protested for lack of sufficient funds, and was sent back through the regular channels to the Olds Savings Bank of Olds, Iowa.

On November 14, 1932, apparently to meet this check, the bills receivable record of the Olds Savings Bank of Olds, Iowa, was falsely stepped up $5,000. The discount register shows that on that date there were actual loans made in the aggregate of $247.40, while the cashbook for that date shows the discounts to be $5,247.40, and also shows a draft returned from the Drovers National Bank of Chicago, for $5,002, the $2 being protest fees.

It is not revealed from the record of the testimony in the case that any effort was ever made to locate R. V. McCutchan, or that his attention was ever called to the fact that this check had been returned dishonored. Neither is there any explanation in the record for the $5,000 increase on the loans and discounts register of the Olds Savings Bank, nor any explanation as to who did this, except that the assistant cashier, who was the only person other than Morgan working in the bank, testified that the first line containing this false entry in the cashbook was in the handwriting of F. A. Morgan, the cashier. There was introduced in the record, and identified by the assistant cashier, a deposit ticket on the form used by the Olds Savings Bank, which shows that there was a deposit to the account of F. A. Morgan, trustee, of Olds, Iowa, on November 2, 1932, said deposit ticket bearing the statement, "Checks as follows:", and, among the checks listed, an item of $5,000. This corresponds to the $5,000 check, Exhibit 1, *and was the only $5,000 check received by the bank on that date.* The defendant's own testimony shows that he delivered the check to F. A. Morgan. Neither R. V. McCutchan nor McCutchan Land Company had an account in the Olds Savings Bank on November 1, 1932, or November 2, 1932, R. V. McCutchan's account was closed June 13, 1930, and the ac-

count of the McCutchan Land Company was closed May 2, 1932, and this check was not deposited to either of these accounts.

The Olds Savings Bank of Olds, Iowa, went under Senate File No. 111 in the spring of 1933, and L. E. Fleak of Winfield, Iowa, was sent there by the state banking department as deputy manager, and he remained there from April 7, 1933, until the bank closed and went into the hands of a receiver on July 22, 1933. Mr. Fleak testified:

"In tracing Exhibit No. 1, I first found where the check for $5,000.00 had been returned. Then I moved up to find out where the check had been remitted out. Then referred to the remittance book and found a sheet linking it up with this check. The remittance loose leaf register sheet would be Exhibit No. 3, which showed that $5,000.00 had been charged against the assets of the Olds bank on the return of Exhibit No. 1. It had been charged to the Drovers National Bank, taken off their balance with the Drovers National Bank, and there was only one item of $5,000.00 to cover that check, and that was the bills receivable. The bills receivable amounted to two hundred and forty some dollars on the register, and the daily journal shows that day for bills receivable $5,247.40. I found Exhibit No. 1 on November 2nd, in the list of checks and deposits, *only one $5,000.00 item*. I looked in the deposit tickets for that day and located that deposit ticket but it was F. A. Morgan, Trustee. *That was the only $5,000.00 deposit ticket on that day's business."*

It is the contention of the defendant that he planned this whole scheme for the benefit of Mr. F. A. Morgan, and explained it all to him at the time he gave him the check; that Mr. Morgan requested him to give him the check; that he received nothing of benefit or value because of the issuance of this check. The jury found that the bank sustained a loss in the amount of $2,262.80. This is the exact amount of a check drawn by R. V. McCutchan on the Olds Savings Bank of Olds, Iowa, under date of October 27, 1932, payable to the Atchison, Topeka & Santa Fé Railway Company, which the evidence plainly shows was in some way charged against the account of F. A. Morgan, trustee. This check is known in the record as Exhibit 7. At the time this check, Exhibit 7, was issued, neither R. V. McCutchan nor the McCutchan Land Company had any account in the bank at Olds, Iowa, and no funds on deposit there to meet this

check. V. E. Nordstrom, who was assistant cashier of that bank, testified:

"R. V. McCutchan's signature appears on Exhibit No. 7. It does not show that it was paid by the bank. It hasn't the bank's stamp on it. It was charged against the funds of the Olds Savings Bank. It must have been taken care of some way, but I couldn't say how. Exhibit No. 14 is remittance sheets from the Federal Reserve Bank at Chicago. It has an item of $2,262.80 which indicates that an item of that amount was paid. We received Exhibit No. 7 from the Federal Reserve Bank at Chicago. Exhibit No. 15 is a copy of deposits and checks for November 3, 1932, and it has on that date a sum of $2,262.80 and it indicates that either that check was paid or another check was supplied to take the place of it. If the other check was supplied, the other check would be cashed. That amount of money went out that day, debited to some account. I am not able to tell to whose account it was deposited."

The evidence further shows that on October 31, 1932, R. V. McCutchan drew another check on the Olds Savings Bank, payable to W. E. Martin, for $2,105.97, which was cashed by Martin at the Exchange Bank of Kahoka, Missouri. Martin was the collector of taxes of Clark county, Missouri. This check was also charged against the F. A. Morgan trustee account, the matter being handled as follows: There was introduced in evidence a check on the Olds Savings Bank, bearing date of November 3, 1932, signed by F. A. Morgan, trustee, and made payable to the order of ———— for $2,262.80, across the face of which was stamped: "The Olds Savings Bank of Olds, Iowa, Paid November 3, 1932" and a similar check, on the Olds Savings Bank, bearing date of November 5, 1932, for $2,105.97, signed by F. A. Morgan, trustee, and made payable to the order of ————, across the face of which was stamped: "The Olds Savings Bank of Olds, Iowa, Paid November 5, 1932." The record in this case reveals no explanation of this matter, except it is claimed by the defendant, who took the witness stand in his own defense, that the bank owned a farm in Clark county, Missouri, known as the McKee farm, of 1,610 acres; that the farm was practically all in blue grass; that he was managing the farm for Mr. Morgan, and they had stocked this farm with cattle, totaling 1,100 head; and that this check, Exhibit 7, for $2,262.80, was given for freight on nineteen carloads of cattle purchased. He admits that the

cattle were purchased in his own name and that he gave his note and mortgage therefor. He says this was for convenience. Three of the directors and the assistant cashier were placed on the witness stand in rebuttal, and they all testified that the board of directors had never authorized McCutchan to purchase any cattle, nor authorized Morgan to employ him for that purpose, and there is no evidence that they knew of the purchasing of any cattle by Morgan or McCutchan, and the jury might well find and believe from all the evidence in the case that this Missouri farm deal was a trading proposition or side line carried on by Morgan and this defendant, which they attempted to finance through the Olds Savings Bank, and the check, Exhibit 7, was issued in payment of freight on the defendant's own cattle, and came out of the funds provided by the $5,000 check, Exhibit 1.

At this point it should be said that, as far back as April 1, 1932, the state banking department had required the directors of the Olds Savings Bank, including F. A. Morgan, to sign an agreement to the effect "that none of the notes or checks or any advancements whatsoever of or to the McCutchan Land Company or Robert B. McCutchan (son of the defendant) or R. V. McCutchan, or any of their partners or agents shall come into or become a part of the assets of this bank without first securing approval of the Superintendent of Banking or one of his examiners". This agreement was introduced in evidence over the objections of defendant, and is known in the record as Exhibit No. 44.

The defendant was already indebted to the Olds Savings Bank to the extent of from $15,000 to $17,000, but it appears that this order of the banking department did not stop the ravage of the McCutchan Land Company and R. V. McCutchan upon this bank. On April 9, 1932, a check was issued for $200 signed by the McCutchan Land Company, bearing first the indorsement of a hotel in Pueblo, Colorado, and on May 25, 1932, another check for $125 of the same kind was issued, and on October 15, 1932, another check for $804.30 was issued for more freight on cattle; this check being payable to Robert B. McCutchan and signed by R. V. McCutchan. There are twenty or twenty-five such checks, ranging in amounts from $10 up to $2,262.80, drawn by McCutchan Land Company or R. V. McCutchan on the Olds Savings Bank, which were issued after, and in defiance of, the order of the banking department and paid out of the funds in the Olds Savings Bank. During none of this

period covered by these checks did McCutchan Land Company or R. V. McCutchan have an account in said bank or funds to meet these numerous checks, and no arrangement made with the bank to meet them.

The defendant glibly testifies to managing this Missouri farm deal, and of the many trips made to Colorado and Illinois in an effort to trade off this farm, entailing vast expense, which was all paid out of the funds of the Olds Savings Bank unbeknown to the bank except to Morgan. He claims that the Olds Savings Bank got possession of this farm through a trade which he made for some notes secured by a second mortgage on the McKee farm (there was a first mortgage for $55,000 against it); that they foreclosed this mortgage and took the title in the name of F. A. Morgan, who later deeded it to Robert McCutchan, son of R. V. McCutchan, in order that he might get a federal loan; that he was about to trade this farm for a ranch near Pueblo, Colorado; that this deal involved around a million and a half dollars, 27,000 acres of land, which had on it 65 houses and barns, 100 miles of four-wire fence, and feed yards to accommodate 25,000 head of cattle.

There were admitted in evidence, over the objections of the defendant, these numerous checks which he drew on the Olds Savings Bank at Olds, Iowa, during the year 1932, when he had no account in the bank, and which the assistant cashier testified were paid out of some account in the bank, but he was unable to state against what account a number of these checks were charged. The jury might well believe from the testimony that, if the bank was actually the owner of this farm and dealing so extensively in the cattle business, the assistant cashier and the directors of the bank would have known something about it, and, had the bank actually owned the farm and the cattle business, that the same could have been financed in the regular way through the bank with the full knowledge of its officers, instead of in the clandestine manner shown by the evidence.

The defendant testified that Morgan knew all about this entire affair, and that, in fact, he was merely the employee of Morgan. The defendant, no doubt, sought to show by this evidence, under the general rule of agency, that what the agent knew the principal was bound to know, and therefore the bank was at all times cognizant of what was being done. It may be conceded for the purpose of the consideration of this question that it is impossible to read the record and arrive at any other rational conclusion than that McCutchan,

through the illegal connivance of F. A. Morgan, the cashier of this bank, was carrying on this farm and live stock business in Missouri, in his own name, and financing the same by the use of the funds of the Olds Savings Bank, and that, the bank being short of cash, this check, Exhibit 1, was made and put in circulation with the fraudulent intent and purpose of furthering this unlawful scheme. Mr. Morgan's connection with, and relationship to, the unique financial plans and schemes of this defendant, have given the court no little difficulty, which will be hereinafter dealt with more fully in the consideration of the legal questions involved herein. It will suffice to say at this point that, even though Mr. Morgan was the agent of the Olds Savings Bank, in all these matters he was going beyond the scope of his employment, without any legal authority from the board of directors, but, on the contrary, in the teeth of the express agreement of the directors with the state banking department not to accept any more checks, etc., of the McCutchan Land Company or R. V. McCutchan. He had no authority of law to warrant his authorizing the expenditure of vast sums of money in the purchase of cattle in the name of McCutchan, or authorizing R. V. McCutchan to write checks on the bank in which he had no funds and no authority to pay the same, and, if Morgan knew as much about this whole scheme as the defendant claims, he became *particeps criminis* in defrauding the bank, and, unless the bank had actual knowledge of the facts, the knowledge of Morgan, the cashier, acquired under such circumstances would not be imputed to the bank.

The object to be attained in every legal controversy should be to ascertain the truth and, having found the true state of facts, to apply the principles of the law applicable in the solution of the issues involved. The troublesome question in most cases is to find the coveted grain of truth and separate it from the chaff. And so, in the case under consideration, the one man who, by his testimony, could have shed light upon the fact situation, is F. A. Morgan, the cashier of the bank into the coffers of which the defendant had been permitted to reach for financial sustenance and support in the furtherance of his wild speculative schemes. It is not revealed by the record before us why Mr. Morgan was not called as a witness. Apparently, no effort was put forth by either the state or the defendant to procure him as a witness until after the trial was over and a verdict of guilty returned. It is then claimed by the defendant, in an effort to obtain a new trial, that he had *assumed*

that Morgan would be present at the trial, and that his testimony would be available if he should see fit to call him as a witness, but that on the second day of the trial, when it was too late to ask for a continuance, he, the said Morgan, took sick with the flu. There is no showing that he had been subpoenaed as a witness or that any postponement of the trial was asked or desired upon learning of the illness of Morgan.

The jury, the fact-finding body under our system of jurisprudence, was thus deprived of the benefit of the testimony of the one central figure, who, as is plainly evident, had been the controlling power in the management of the affairs of the Olds Savings Bank. The jury had to take the case as presented from the records found in the bank after it had been closed and the shades drawn down and the crash of wreck and ruin of another banking institution had settled down like a pall over the little village of Olds, situated in one of the most fertile agricultural spots of all Iowa; from the little knowledge possessed by the assistant cashier and directors; and from the testimony of the bank examiners called in to take charge of what was left of a once sound and prosperous financial institution, who traced as best they could the trail left by those who had by cunning and clandestine methods drained the life blood of the corporate body into which the honest yeomen and business men, wives and children, had placed their savings. In the light of the explanations proffered by the defendant, applying thereto the law as given by the trial court, and in the light of their own good common sense and their knowledge of men and things, and from all the facts and circumstances surrounding the transactions as shown by the evidence, twelve men and women, "good and true", selected from the jury panel of Henry county, passed upon the question of the guilt or innocence of the defendant. They have spoken. We cannot say, after a careful and conscientious consideration of the entire record, that the verdict is not warranted.

Being thus satisfied with the result found by the jury on the fact issues, it only remains for us to determine whether or not the defendant has had a fair and impartial trial and to ascertain that no prejudicial error of law has been committed.

The first four assignments of error relate to factual matters, all of which the jury passed upon, and as to all of which we have already found adversely to defendant's contentions; his chief complaint in all of these assignments being that the indictment

charges the uttering of a $5,000 check and that the jury based its verdict on the $2,262.80 check, and that this check was not mentioned in the minutes of the evidence attached to the indictment, and the defendant was therefore not apprised of the real charge against him. We have examined into this matter carefully and find ourselves constrained to disagree with the defendant's contention in this regard. What the jury found was that the loss sustained by the Olds Savings Bank in the uttering of the $5,000 check described in the indictment was the sum of $2,262.80. There is nothing in the statute which requires that the amount of the loss must correspond to the exact amount of the alleged falsely uttered check upon which the indictment was returned. See Code, section 13047; State v. Gibson, 132 Iowa, page 53, 106 N. W. 270.

Neither is it required on the part of the state that every fragment of testimony be set out in the minutes of the testimony before the grand jury and the legislature has made ample provision covering matters of this kind, and, if the defendant were not satisfied with the showing made in the minutes of the testimony before the grand jury, under section 13732-c4 of the Code, he was entitled to a bill of particulars, but none was requested.

It is further strenuously contended by the defendant that the state failed to show that the bank at Olds lost anything of value, or that the defendant received any benefit or thing of value in Henry county, Iowa. His contention is that, if the freight check, Exhibit 7, for $2,262.80, was used to pay freight on defendant's cattle, this was not money received, but what he received was the discharge of his freight bill, and that this benefit took place in the state of Missouri. We cannot subscribe to defendant's reasoning or logic. It is true that the freight bill was discharged in Missouri, but the money to meet the check that discharged the freight bill was found in the Olds Savings Bank, located in Henry county, Iowa. It got there by means of the check, Exhibit 1. The defendant admits in his testimony that he hatched up this plan to get money for Morgan and into Morgan's bank. This freight check, as well as the other check for taxes, issued on October 27 and October 31, respectively, were outstanding, and he knew it. Nothing could be plainer than this from all the testimony. It was the fact that these two checks totaling over $4,300 were outstanding that created the instant demand for cash or cash items to meet them. They were already in circulation when Exhibit 1 was cashed. The defendant knew all

about the issuance of these checks, and he knew how he had planned to get the money into the Olds Savings Bank to meet them. Further than this he had made no plans. From that point on it was up to the bank or banker to do the worrying. The record of the bills receivable was the only place to which the banker could turn; hence, the falsification of this record.

We are not inclined to believe that the defendant was taken unawares or was in the least surprised at what was brought out in the evidence at the trial. According to his own statement he planned the whole scheme. Courts and juries are not required to strain at gnats to free one from the meshes of the fraudulent web he has woven for others and awakes to find it likewise enfolding him.

In his fifth assignment, the defendant raises the question of venue, asserting that the essential venue of the crime was not established by the evidence, and that the question of venue was not submitted to the jury. We have examined the court's instruction with reference to this matter and the jury was plainly charged that they must find the crime was committed in Henry county, Iowa, which is all that the law requires. It is the defendant's claim that the crime was not committed in Henry county, Iowa, and argues that there is no evidence that the defendant was ever in Henry county, Iowa, or that he ever presented the check to the Olds Savings Bank. It is his claim that the crime is committed only in the county where the money or thing of value is received, and he relies upon the case of State v. Smith, 162 Iowa 336, 144 N. W. 32, 49 L. R. A. (N. S.) 834. We have read this case and find that the excerpt from this case set out in the argument of counsel for the defense is not borne out by the holdings of the court. In fact the court holds to the exact opposite of his contention. In the Smith case the point raised was that Polk county had no jurisdiction because the money was not obtained in Polk county nor the false pretenses made in that county, and that the defendant should be held to answer, if at all, in Cass county, where the check was ultimately paid by the bank upon which it was drawn. This court held in that case that the crime was partly committed in Polk county, where the defendant cashed the check, which would correspond in this case to Henry county, where the $5,000 check was cashed by the Olds Savings Bank. In the case at bar, the check was never honored or cashed by the bank upon which it was drawn. In the Smith case the court specifically said: "We do not now decide that

defendant could not have been prosecuted in Cass county under the statute." See, also, as bearing on this question, State v. Detloff, 201 Iowa 161, at page 164, 205 N. W. 534. In the case of State v. George, 206 Iowa, page 826, 221 N. W. 344, another case of obtaining money by false pretenses, our court, speaking through Justice Morling, said:

"Defendant urges that the money was paid to him in Appanoose county and the venue should have been laid there. The record here is not clear in what county it was that the prosecuting witness parted with $50 of the loan, though as we read the evidence the prosecuting witness paid defendant 'the balance of the loan' in his office in Ottumwa. * * * We are of the opinion that the evidence, if it shows the commission of the crime, may be held to show that it was committed partly in Wapello county, and partly in Appanoose county, and that the indictment might be found in either county."

Section 13451 of the Code of 1931 provides:

"When a public offense is committed partly in one county and partly in another, or when the acts or effects constituting or requisite to the consummation of the offense occur in two or more counties, jurisdiction is in either county, except as otherwise provided by law."

It is true that the defendant testified that he delivered the $5,000 check, Exhibit 1, to F. A. Morgan in Keokuk, Iowa. Needless to say, the jury was not bound by his declaration. It was the province of the jury to consider all the circumstances surrounding the transaction, and the execution and delivery of the check, the entries on the books of the bank, the fact that the check was cashed at the bank in Olds and not presented for payment at the bank in Keokuk upon which it was drawn, and all the other facts and circumstances surrounding the case and shown by the evidence in arriving at the question of where the crime was committed. In State v. Meyer, 135 Iowa 507, at page 511, 113 N. W. 322, 124 Am. St. Rep. 291, 14 Ann. Cas. 1, we said:

"The fact of venue may be established like any other fact and, where the fair inference from the evidence adduced or the circumstances proven is that the transaction in issue occurred within the county, the finding of the jury cannot be disturbed on appeal."

██ · The defendant also complains and cites as error the overruling of his motion for directed verdict at the close of the state's evidence, claiming that at that state of the trial there was no evidence to show that the crime occurred in Henry county, Iowa, or that the bank at Olds had sustained any loss, claiming that the books of the bank were shown to be in balance, that there was no evidence that the defendant received anything of value in Henry county, and no showing of fraudulent intent and no showing that the check was issued by the defendant knowingly not having arrangements or understanding or funds with the State Central Savings Bank of Keokuk, Iowa. It may be conceded that the state had a much stronger case against the defendant after the defendant had taken the witness stand and given his testimony. We are not prepared to say, after careful consideration of the whole record, that the state had not made out a case for the jury at the close of the state's testimony. What we do hold is that at the close of all the evidence there was ample evidence to support the verdict. This court has held in the recent case of State v. Sharpshair, 215 Iowa 399, 245 N. W. 350, as follows: "If at the close of the entire case, there was sufficient evidence to warrant its submission to the jury, the case will not be remanded for retrial."

██ It is next contended by the defendant that the court erred in overruling his motion for a directed verdict at the close of all the testimony, and at this point he cites as reasons among others that Morgan took the check with knowledge and being cashier of the bank, his knowledge was imputed to the bank. As heretofore stated, this question has given the court no little difficulty. It appears from the record that all these various transactions were carried on through the Olds Savings Bank by R. V. McCutchan on the one hand and F. A. Morgan, cashier of the Olds Savings Bank, on the other. Under the circumstances disclosed by the evidence in this case, was knowledge of F. A. Morgan, agent and employee of the Olds Savings Bank of the scheme and plan testified to by the defendant, and as shown by the manipulation of the records in the bank, imputed to or brought home to the bank? In the case of Watt v. German Savings Bank, 183 Iowa 346, at page 364, 165 N. W. 897, this court said:

"The general rule is that the principal is bound by the knowledge of the agent, and that rule is based on the duty of the agent to communicate to the principal his knowledge with reference to

the subject of the negotiation, and the presumption that he has performed that duty. There are exceptions to this rule, however, as where to disclose information to a principal would violate professional confidence, or be inimical to the agent's interest, *or where the circumstances are such that, in all reasonable probability, the principal was not informed by the agent.*" (Italics are ours.)

At page 366:

"The directors of a bank constitute its governing body. As such they superintend and control all its affairs, and in the fullest sense represent the bank, and notice to it [the board] was notice to the principal, regardless of having agencies through which to transact its business. * * * 'What the directors know regarding matters affecting its interests, the corporation knows.' "

At page 378:

"[However], even the officers of a bank cannot be permitted to serve two masters having conflicting interests at the same time, themselves and the bank, and when speaking in their own interests, when antagonistic to those of the bank, what they may say cannot be treated as declarations binding their principal, the bank. *This is for the reason, among others, that such declarations cannot be said to have been made in the course of their employment by, or in the performance of their official duties in behalf of the bank.*" (The italics are ours.)

In the case of Hummel v. Bank of Monroe, 75 Iowa 689, at page 692, 37 N. W. 954, speaking of the exceptions to general rule that knowledge of the agent is knowledge of the principal, this court said:

"And we think another exception, founded on a similar reason, arises when the circumstances are such as to render it certain that the agent did not communicate his knowledge or information to his principal. The notice to the principal of such facts as were known to the agent, and were present in his mind at the time of the transaction, but the knowledge of which was not acquired in the business of the agency, is constructive. Ordinarily, the circumstances are such as to beget a presumption that the communication was in fact made. But when they are of such character that, according to all human experience and observation, the probability is just the re-

verse, it would be absurd to indulge that presumption. * * * In the present case, if defendant had had actual notice when it took the draft of the facts known to Anderson, it would have been chargeable. But there is no probability that it would, with that knowledge, have taken it, and thereby incurred the liability. If he had communicated to it the facts within his knowledge before receiving the benefits which accrued to him under the transaction, all the objects he had in view would have been defeated. His connection with the transaction with plaintiff, and his object in disposing of the draft, were such that it is extremely improbable that he ever made the communication to it, and we think it cannot be charged with constructive notice of the facts."

In the case of Sebald v. Citizens Deposit Bank, a Kentucky case, 105 S. W. 130, at page 132, 14 L. R. A. (N. S.) 376, in considering this question the court said:

"The whole doctrine of imputed knowledge arising from the relation of principal and agent, wherein the knowledge of the latter, acquired or in mind in the course of a transaction within the scope of his agency, is deemed to be the knowledge of the principal, is based upon the presumption of the fact that the agent has communicated to his principal what the former knows affecting the interests of the latter. It is his duty to do so, and therefore it is conclusively presumed that he has done so. But an exception to the rule, which is as well fixed and as logical and just as the rule itself, is that where the agent is dealing for himself, and not for the principal, *or is perpetrating a fraud upon his principal,* the presumption that he would communicate his knowledge to his principal is contrary to the experience of men and to their nature. It would be doing violence to every probability to presume that the agent under such circumstances would communicate his knowledge to his principal. Hence it would be unjust and illogical to impute the knowledge of the agent under such circumstances to the principal." (The italics are ours.)

In the case of Graham v. Orange County Nat. Bank, 59 N. J. Law 225, 35 A. 1053, we find this language:

"The defense was that Murray knew that the note was given to raise funds for an illegal purpose, and that his knowledge was imputable to the bank. The law upon the subject of imputable knowl-

edge is laid down by this court in the case of Willard v. Denise, 50 N. J. Eq. 482, 26 A. 29. In the case before us Murray did not act at all for the bank. His conduct was actuated wholly by personal reasons; and, if he knew that he was taking part in an unlawful transaction, the bank cannot be charged by his guilty participation."

In the above case, Graham, the defendant in the suit, had made a note payable to, and indorsed by, G. W. Murray, which was discounted by the plaintiff bank. At the time the note was thus discounted, Murray, the payee of the note, was president of the plaintiff corporation, and together with its cashier constituted the discount committee.

If, as contended by the defendant, he imparted to Morgan, the cashier of the bank, the fraudulent scheme and plan by which money could be obtained to meet the outstanding checks which the defendant had issued in the financing of his own private business, and Morgan knew all about the fraudulent scheme and plan, he thereby became a party to the fraud in aiding in its execution, and to hold that under such circumstances, when the agent was engaged in perpetrating fraud upon his principal, that knowledge to the agent would be knowledge to the principal, would be absurd. As stated in Sebald v. Citizens Deposit Bank, supra, "it would be doing violence to every probability to presume that the agent under such circumstances would communicate his knowledge to his principal. Hence it would be unjust and illogical to impute the knowledge of the agent under such circumstances to the principal." See, also, as touching upon this question, Farmers Bank v. Payne, 25 Conn. 444, 68 Am. Dec. 362, at page 365; Barnes v. Trenton Gas Light Co., 27 N. J. Eq. p. 33.

It is next contended by the defendant that the court erred in permitting to go to the jury prejudicial evidence, especially pointing out the admission in evidence of numerous checks drawn on the Olds Savings Bank during the year 1932, his contention being that the indictment charged a statutory specific offense, and that these checks were not admissible under the theory of other similar offenses, and that the jury was not instructed as to the purpose for which these checks were admitted in evidence; also, that it was error to admit in evidence the contract between the directors of the Olds Savings Bank and the state banking department of April 1, 1932, known in the record as Exhibit 44, for the reason that it

tended to arouse bias and prejudice in the minds of the jury against the defendant and did not tend to establish any issue.

It has long been the rule in this state that evidence of other offenses is competent to establish (1) motive; (2) intent; (3) absence of mistake or accident; (4) common scheme or design; and (5) the identity of the person charged with the commission of the crime on trial. State v. Vance, 119 Iowa 685, 94 N. W. 204.

The checks drawn on the Olds Savings Bank by McCutchan during the year 1932 are admissible on another theory, namely, in establishing the amount of the loss caused to the Olds Savings Bank on account of the issuing of the check, Exhibit 1. Practically all these checks were charged against the account of F. A. Morgan, trustee, and, as we have heretofore shown, there was evidence from which the jury might reasonably find that the check, Exhibit 1, was deposited in this account. In fact, there is no other reasonable or rational theory, as shown by the evidence. They were all admissible to show fraudulent intent in connection with Exhibit 44.

Before evidence of other or similar checks could be admitted in evidence, it was necessary that there be some showing made that at the time they were issued there was no money in the bank to meet the same and that they were issued knowing that no arrangements to meet the same had been made with the bank. Exhibit 44 discloses that on the 1st day of April, 1932, the line of credit and the dealings of the McCutchans with this bank had become so objectionable to the banking department that they compelled the directors to sign this agreement, and notwithstanding the existence of this agreement, the defendant persisted in writing checks against the Olds Savings Bank where he had no account and no money, and this agreement shows that he had no credit or standing.

Exhibit 44 bears on another issue—that of fraudulent intent. There could be no stronger proof of willful fraud than the fact that, in the face of this agreement and in the face of the fact that he was already indebted to the bank at Olds in a sum of $17,000, and had no reason to expect or believe that the bank would honor his checks, he continued to write checks and demand credit which did not legally belong to him and which had been emphatically denied him, and, willfully and knowingly, with intent to accomplish his illegal purpose, continued to carry on his Missouri farm and cattle deal by financing the same out of the funds of the Olds Savings Bank. There was no error in admitting such evidence.

Another check, issued on December 31, 1932, in the amount of $5,000, was almost an exact duplicate of the transaction referred to in the indictment. This check was drawn on the bank at Keokuk, credited to the Morgan trustee account, sent to the Drovers National Bank, and returned unpaid, charged back to Morgan's account as trustee.

 Since the evidence of these similar transactions was admissible as tending to prove one or more of the issues involved, it follows that, if the defendant desired an instruction limiting said evidence to the particular purpose for which it was admitted, he should have requested the court to give the same, and this he did not do. State v. Dillard, 205 Iowa 430, 216 N. W. 610.

Complaint is next made because the court refused to give certain requested instructions. We have examined the instructions requested in connection with those given by the court, and it is our conclusion that the matters therein contained, in so far as pertinent were fully covered by the instructions given by the court. There are other objections and complaints of a general nature, which are not specifically pointed out nor especially argued, and under the rules, this court should not be expected to give them any consideration. However, we have carefully considered all the errors assigned by the defendant and the authorities cited in support of all his contentions, and it is our conclusion that the evidence complained of was properly admitted, and that the instructions of the court fairly submitted the disputed issues of fact to the jury, and the jury having returned a verdict of guilty, which is supported by competent evidence, as heretofore found by the court, it follows that the cause must be necessarily affirmed.—Affirmed.

ANDERSON, C. J., and PARSONS, ALBERT, MITCHELL, DONEGAN, POWERS, and KINTZINGER, JJ., concur.